IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

LAUREN PAULSON,                          )
                                         )
                    Plaintiff,           )        Case No. 04-1501-KI
                                         )
        vs.                              )        OPINION AND ORDER
                                         )
WILLIAM CARTER, President of the         )
Oregon State Bar, THE OREGON STATE       )
BAR, KAREN GARST, GEORGE                 )
REIMER, LISA LESAGE, DENNIS              )
RAWLINSON, NENA COOK and JEFF            )
SAPIRO,                                  )
                                         )
                    Defendants.          )

        Lauren Paulson
        3980 S. W. 170th Avenue
        Aloha, Oregon 97007

                Attorney for Plaintiff

        Susan K. Eggum
        621 S. W. Alder Street, Suite 600
        Portland, Oregon 97205

                Attorney for Defendants

KING, Judge:

Plaintiff Lauren Paulson, an attorney licensed to practice law in Oregon and a member of the Oregon State Bar ("Bar"), brings First Amendment and defamation claims against the Bar, Bar President[1] William Carter, Bar Executive Director Karen Garst, Bar Vice-President Lisa LeSage, Bar President-Elect Nena Cook, Bar General Counsel George Riemer, and Jeff Sapiro, manager of the Bar's Regulatory Services and Discipline Department and the Bar's Disciplinary Counsel.

There has been extensive motion practice against the three complaints filed in this action. On April 6, 2005, I filed an Opinion and Order addressing numerous motions to dismiss portions of the Second Amended Complaint ("SAC"). Although I dismissed many specific allegations in the SAC, I instructed the parties that we would proceed without the filing of an amended complaint that complied with my rulings. Currently before the Court is Defendants' Motion for Summary Judgment (#195) and Defendants' Motion to Strike Portions of Plaintiff's Submissions in Opposition to Summary Judgment (#230). For the reasons below, I grant the motion for summary judgment and dismiss the remaining claims.

## MOTION TO STRIKE

Defendants move to strike numerous portions of the materials Paulson filed to oppose the summary judgment motion. I decline to rule on the motion to strike Paulson's concise statement of facts. When facts are in dispute, the Court uses the concise statement as a road map to the evidentiary record and not as evidence itself. I also decline to make specific rulings on whether a

---

[1] The offices held by defendants were current at the time the original Complaint in this matter was filed but have since changed.

submission is relevant. If it is not relevant to my analysis, I will not refer to it. Finally,

defendants contend that eight of Paulson's exhibits are not properly authenticated. Although

defendants' objections are well taken, for example the authentication requirements for deposition

transcript excerpts as explained in Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 (9th

Cir. 2002), I decline to strike the excerpts this time. Because I am ruling against Paulson, I will

give him the benefit of every doubt.

## FACTS

On November 16, 2002, Paulson took the oath of office for service on the Bar's Board of

Governors ("BOG") to represent Region 4, for a term running from January 1, 2003 to

December 31, 2006. Carter was a member of the BOG in 2002, President-Elect of the Bar during

2003, and President of the Bar during 2004. LeSage was a member of the BOG until

December 31, 2004. Cook was a member of the BOG in 2002 and served as Bar President

during 2005. Rawlinson joined the BOG at the same time as Paulson and became Bar President

on January 1, 2006.

The BOG governs the Bar, carries out its executive functions, and has rulemaking

authority. The BOG approves the Bar's operating budget and has the authority to increase or

decrease the operating funds of the Disciplinary Counsel's Office. The BOG has the authority to

appoint Local Professional Responsibility Committees ("LPRCs") to investigate the conduct of

attorneys. The BOG also has the authority to appoint members to the Bar's State Professional

Responsibility Board ("SPRB") to review the conduct of attorneys and to institute formal

disciplinary proceedings against them.

Also on November 16, 2002, the SPRB approved formal prosecution against Paulson for ethics charges based on the complaint of Mark Gensman. At that time, at least 23 ethics complaints against Paulson had been investigated by the Bar since 1990.

On October 15, 2003, Paulson used the Bar's staff resources to send an email newsletter to his constituents. One of the newsletter's comments concerned the new disciplinary rules addressed at the recent House of Delegates ("HOD") meeting. Paulson stated:

> It is interesting to be on the BOG and watch the process. In a way, it is an 'US' versus 'THEM' process. But, I do not think I am worthy to judge yet. Delegate Max Rae from Salem is the only OSB member out of the 14,000 regular members that actually read all the changes, made thoughtful recommendations in writing and bought into the entire process orchestrated by OSB staff member Sylvia Stevens. . . . There are some hearty members who felt this was a rush to judgment (and a staff driven desire to be consistent with the ABA Model rules).

Carter Decl. Ex. 3. Paulson ended the newsletter with a series of questions on whether the membership is running the Bar, or vice versa, and whether the Disciplinary Counsel staff is generally friendly, fair, and courteous.

Carter responded by email to Paulson and took issue with the tone of the newsletter, particularly the "orchestrated" remark. Carter also sent a blind copy of the email to Garst and one other recipient stating, "I have set out below a blind copy of the email I have sent to Lauren. If he is going to be the crisis of my presidency, we might as well get on with it." Carter Decl. Ex. 4.

Paulson mounted a vigorous defense of his ethics complaints. He requested a meeting with Garst, Sapiro, and Assistant Disciplinary Counsel Martha Hicks to state that the current disciplinary matters were without merit. Carter became concerned that Paulson was attempting to use his office on the BOG to influence the Disciplinary Counsel's office concerning the

investigation and prosecution of the ethics complaints. On December 31, 2003, Paulson notified

Hicks of his intent to file an ethics complaint against her for neglecting the investigation of

*Dascher*. On April 16, 2004, Paulson filed ethics complaints against two volunteer Disciplinary

Board Trial Panel attorneys who had served as volunteer judges in a formal prosecution resulting

in the Oregon Supreme Court's *Ring* decision that was adverse to Paulson. Also on April 16,

2004, Paulson notified Hicks that he intended to take 28 depositions in *Gensman*, including

several judges and several members of the Bar's staff. Sapiro advised his supervisor, Garst, who

advised Carter. On April 20, 2004, Carter sent an email to Garst, Riemer, and Cook:

> Finally, I think I'd like to meet with you, George & Nena to discuss
> Lauren Paulson's behavior – not so much his ethical behavior, since that is within
> Jeff's [Sapiro] jurisdiction, but behavior that could prove damaging to the bar. I
> would like a summary of the more egregious examples of his Rambo style of
> defending himself by charging Disciplinary board members with violations,
> unnecessarily subpoenaing trial and appellate judges, etc. If it reaches the point
> where we think it is damaging to the organization (and I have no reason to think it
> won't), I don't think it would be unreasonable to advise prominent members of
> the bar in his Region 4 what he is up to, in order that they can consider what, if
> anything, they want to do about it. I recognize that this may be exactly what he
> wants (attention and recognition for his status as a "rebel"), but I don't think we
> can sit by and let him disrupt the bar and courts while he is a representative of the
> bar.
>
> I don't want to have any contact with Jeff on this issue, because I don't
> want to interfere, or even appear to be interfering, with his discretion on the ethics
> issues.

Carter Decl. Ex. 8. Carter never did advise any of Paulson's constituents about the issue.

In April 2004, Garst suggested to Carter that the BOG's Budget and Finance Committee

("Budget Committee") consider evaluating the Living Enrichment Center ("LEC") building as a

possible facility for future Bar needs. Garst was a member of the LEC congregation but was

never an officer, director, employee, or creditor of any LEC entity. In 2003, Garst purchased a

Certificate of Deposit from a bank which had extended a line of credit to the Living Enrichment Ministries. Garst pledged the Certificate of Deposit to the bank in 2003 to secure the line of credit.

On May 6, 2004, Garst and a member of the Budget Committee viewed the LEC property. The Budget Committee met the next day to discuss a larger Bar center and the need to analyze the Bar's facility needs. Paulson, who was Vice-Chair of the Budget Committee, attended the May 7 meeting. On May 15, 2004, Paulson wrote the Budget Committee members to express his surprise to learn that Garst had some affiliation with both of the sites being considered. Paulson stated that he considered this to be a conflict of interest.

On June 11-12, 2004, the BOG met and discussed the accuracy and tone of regional communications by BOG members concerning Bar business. A template was being considered for communications to Multnomah County members. The BOG unanimously approved a motion to have the President-Elect be responsible for reviewing regional communications for accuracy before distribution. Paulson attended the first day of the meeting but not the second day, when the motion was passed.

On July 20, 2004, Paulson published a communication on Bar letterhead to the Region 4 HOD voting delegates without first submitting it to Cook, the President-Elect, for review.

Paulson continued to defend his disciplinary matters, making public record requests resulting in thousands of pages of documents, filing motions for reconsideration, and accusing the Bar staff and leadership of misconduct for attempting to influence his defense through intimidation.

The BOG met on August 13-14, 2004. At the meeting, LeSage stated that she believed Paulson had an actual conflict of interest in continuing to serve on the BOG while he raised various issues about the conduct of other board members and staff in connection with a pending disciplinary prosecution against him. After some discussion, Carter appointed a special committee to study the issue.

The BOG previously authorized a publication entitled the <u>Bar Leader Communicator</u> which it uses to publish a summary of discussions and action taken by the BOG for dissemination to the HOD. This is how the BOG keeps the HOD informed of BOG actions. Carter considers the Bar Leader Communicator to be an integral part of the deliberative and communicative process to disseminate relevant information to the HOD, which has the statutory power to direct or rescind BOG actions. On August 23, 2004, the <u>Bar Leader Communicator</u> published a summary of the issues discussed at the August 13-14 BOG meeting, including LeSage's remark.

The special committee met five times to analyze the policy issue presented when a lawyer is serving the Bar in some capacity while simultaneously being disciplined. Paulson participated in each of the special committee meetings. The special committee submitted a report to the BOG on September 28, 2004, which made several recommendations, including passage of a new bylaw. On October 14, 2004, the BOG discussed the recommendations. It passed Bylaw 18.6 by a vote of 10 to 5, with Paulson abstaining. Bylaw 18.6 now states:

Section 18.6. Suspension of Service

Subsection 18.600 Applicability to BOG, LPRC and SPRB

The service of members of the Board of Governors, local professional responsibility committees, and the State Professional Responsibility Board against

whom charges of misconduct have been approved for filing by the State
Professional Responsibility Board is suspended until the charges filed against
them have been resolved.  If a member is suspended as a result thereof, the
member may not resume service on the board or committee until the member is
once again authorized to practice law or as otherwise provided by
ORS § 9.025(5)(a).  Charges of misconduct include those authorized to be filed
pursuant to BR 3.4.[2]

Passage of Bylaw 18.6 resulted in the suspension of Paulson's service on the BOG.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact
and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The
initial burden is on the moving party to point out the absence of any genuine issue of material
fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate
through the production of probative evidence that there remains an issue of fact to be tried.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the
evidence is viewed in the light most favorable to the nonmoving party.  Universal Health
Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

After my rulings dismissing many of the allegations and claims in the SAC, Paulson had
First Amendment, First Amendment retaliation, and defamation claims remaining.

---

[2] On November 20, 2004, the BOG revised Bylaw 18.6 as first enacted to delete
references to the Disciplinary Board originally included in the bylaw.  Disciplinary Board
members are appointed by the Oregon Supreme Court and not the BOG.  The BOG drafted
parallel amendments to Bar Rule of Procedure 2.4(d), concerning suspension of Disciplinary
Board members, which has been approved by the Oregon Supreme Court.  The amendment is
immaterial to the action before me.

I.       First Amendment Claims

    A.       Constitutionality of the Bylaws

        It is a bit difficult to take the long history between Paulson and defendants and divide it
into legal causes of action, which must be done for my analysis.  I first assume that Paulson
challenges Bylaw 18.6 as an impermissible restriction on his freedom of speech.  I also assume
that there is a constitutional right under the First Amendment to remain on the BOG[3] while
disciplinary charges are being resolved.

        The bylaw is content and viewpoint neutral.  It does not dictate what can be said by BOG
members, how they should vote, or whether a member is suspended depending on the content of
their speech.  A content neutral restriction on speech is analyzed under a rational relationship
test. NAAP v. California Board of Psychology, 228 F.3d 1043, 1054, 1055 (9th Cir. 2000)
(licensing laws for mental health professionals) (internal quotation omitted), cert. denied, 532
U.S. 972.  The impetus for the regulation, here defendants' interactions with Paulson, cannot
require a strict scrutiny analysis.  See Black v. Arthur, 201 F.3d 1120, 1123 (9th Cir. 2000) (even
if the agency had specific experiences in mind when adopting a challenged regulation, the
appropriate level of scrutiny is tied to whether the statute distinguishes between prohibited and
permitted speech on the basis of content).

        There is an appearance of impropriety if an active BOG member is defending a
disciplinary charge at the same time he has an oversight function of the entities that prosecute
disciplinary complaints.  There is also an appearance of favoritism, namely that the BOG

_____

        [3]  For brevity, I will refer only to the bylaw's effect on BOG service, even though it
applies to other Bar committees.  No one has raised an argument that the analysis would differ.

member might be treated less harshly, as well as the appearance of an ability by the BOG

member to retaliate against the prosecutorial entities. All of these provide a rational reason for

Bylaw 18.6.

Paulson also argues that Bylaw 18.6 is an unlawful bill of attainder.

"'[L]egislative acts, no matter what their form, that apply either to named individuals or

to easily ascertainable members of a group in such a way as to inflict punishment on them

without a judicial trial are bills of attainder prohibited by the Constitution.'" United States v.

Munsterman, 177 F.3d 1139, 1141 (9th Cir.) (quoting United States v. Brown, 381 U.S. 437,

448-49, 85 S. Ct. 1701 (1965)), cert. denied, 528 U.S. 919 (1999).

> If a law merely designates a properly general characteristic . . . and then
> imposes upon all who have that characteristic a prophylactic measure reasonably
> calculated to achieve a nonpunitive purpose, no attainder may be said to have
> resulted from the mere fact that the set of persons having the characteristic in
> question might in theory be enumerated in advance and that the set is in principle
> knowable at the time the law is passed.

Id. at 1142 (internal quotation omitted) (law prohibiting possession, transport, or shipment of a

firearm by people under indictment for a felony is not a bill of attainder). Another factor

considered is whether the class of people is defined by "irreversible acts committed by them."

Seariver Maritime Financial Holdings v. Mineta, 309 F.3d 662, 671 (9th Cir. 2002).

Here, the suspension under Bylaw 18.6 only lasts until the disciplinary charges are

resolved, as when the lawyer prevails, or until any suspension from the practice of law imposed

as discipline has passed. Thus, the definition is not based on irreversible acts. Moreover, as

discussed above, there is a legitimate nonpunitive purpose for the bylaw, namely to remove the

appearance of any conflict, favoritism, or retaliation. Consequently, I conclude that Bylaw 18.6

is not a bill of attainder.

Paulson also alleges that Bylaw 18.107 precludes his freedom of speech:

Subsection 18.107 – Notice to the Accused

> Disciplinary Counsel will notify the accused as soon as possible after the SPRB has directed the institution of a formal disciplinary proceeding against the accused. The notice will contain a statement that all communications on the merits of the matter must be restricted to the lawyers in Disciplinary Counsel's office and with appointed counsel for the Bar and that an accused must not contact a member of the Board of Governors, the SPRB, any Local Professional Responsibility Committee or any other employee, agent or representative of the Bar regarding the matter.

Paulson alleges that this bylaw precludes his freedom of speech when accused of a disciplinary violation while at the same time giving Bar committee members and staff the unrestricted ability to defame the accused.

Again, Bylaw 18.107 is content neutral because it prohibits *all* communications on the merits when made to particular people. I first note that the bylaw only pertains to the merits of a disciplinary matter, not to anything else an accused may wish to discuss, such as the wisdom of certain Bar policies or conduct. It is in the nature of a rule prohibiting ex parte conduct so that an accused does not have the chance to improperly influence Bar leaders and the people making the decision on the disciplinary charge. Thus, it also has a rational reason and does not violate the First Amendment.

Neither Bylaw 18.6 nor Bylaw 18.107 violates the First Amendment. Summary judgment is granted dismissing any claim alleged by Paulson that they do.

B.     First Amendment Retaliation

Paulson alleges that defendants violated the First Amendment by retaliating against him for his speech questioning the actions of the Bar and the individual defendants. The retaliation allegedly took the form of passing Bylaw 18.6, prosecuting ethical charges against Paulson,

refusing to mediate the ethical charges, requiring approval of Paulson's newsletter prior to distribution, denying Paulson any assigned responsibilities, defaming Paulson, and demanding that Paulson resign from his BOG position.

To prove a First Amendment retaliation claim, a plaintiff must show "that by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999). Actual inhibition of speech is not required. The correct inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Id.

Defendants raise numerous defenses. I'll address each type of retaliation separately.

Paulson contends that passing Bylaw 18.6 was a retaliatory act.

Statutes provide that the Bar is governed by the BOG, which has the authority to adopt, amend, and repeal bylaws. ORS 9.080(1).

Municipal legislators enjoy the protection of immunity when acting within the "sphere of legitimate legislative activity." Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) (internal quotation omitted). Legislative acts "must be an integral part of the deliberative and communicative processes" by which legislators participate in proceedings with respect to the consideration and passage or rejection of legislation. Gravel v. United States, 408 U.S. 606, 625 (1972).

In the Ninth Circuit, two questions are relevant to the determination of whether an act is legislative in nature: (1) whether the act involves ad-hoc decisionmaking or the formulation of policy; and (2) whether the act applies to a few individuals or to the public at large. San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 476 (9th Cir. 1998).

Applied here, passage of Bylaw 18.6 was not done in an ad-hoc fashion. A special committee was formed and met several times to discuss the issue. Paulson was allowed to take part in these meetings to provide his input. The committee drafted a report containing several recommendations. The BOG adopted some recommendations, including Bylaw 18.6, and did not adopt others. Although Paulson insists that the Bylaw is aimed squarely at him, it is written in a neutral fashion and would apply equally to any members of the named committees who have pending disciplinary charges or suspensions resulting therefrom. I conclude that the passage of the bylaw, and all acts done to allow for passage of the bylaw, are protected by legislative immunity.

Paulson states that Garst, Riemer, and Sapiro retaliated against him by causing the Bar's disciplinary department to file false ethical complaints against him. As I held in my Opinion and Order dated April 6, 2005, ORS 9.537(1) provides absolute immunity for making a complaint to the Bar concerning the conduct of an attorney. This immunity would also apply to the defamation claim.

Paulson states that he was denied any assigned responsibilities, but goes on to state that he was the Vice Chair of the Budget and Finance Committee and a member of the Executive Director Evaluation Committee. Paulson Decl. ¶¶ 14, 18, 30. Paulson also states that Carter demanded that Paulson resign from his BOG position. The First Amendment does not protect Paulson from any of this behavior. Paulson also has no right to any particular committee assignment. See Davids v. Akers, 549 F.2d 120 (9th Cir. 1977) (constitution does not require that appointments to standing committees in a state legislature be made in proportion to the number of members in the major parties). Paulson's own evidence shows that his contention that

he was denied any assigned responsibilities is exaggerated. Finally, Carter has First Amendment rights, as does Paulson. Either may demand that the other resign without violating the constitution. See Colson v. Grohman, 174 F.3d 498, 513, 515 (5th Cir. 1999) (retaliatory criticisms, investigations, and false accusations among city council members are not actionable under § 1983 for First Amendment retaliation; "defendants' allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure").

Paulson alleges that the BOG's requirement that regional communications be reviewed for accuracy before distribution was enacted in retaliation for his speech.

The passage of the motion requiring the review is protected by legislative immunity, as explained above. Cook, as the BOG officer given the duty to carry out the directive, was acting under the BOG's authority and did not violate Paulson's First Amendment rights. I first note that there is no evidence that Paulson ever submitted a communication for approval or that any of his communications were edited. Further, "when the State is the speaker, it may make content-based choices." Downs v. Los Angeles Unified School District, 228 F.3d 1003, 1013 (9th Cir. 2000) (school district could restrict messages conveyed on school faculty bulletin boards), cert. denied, 532 U.S. 994 (2001). Paulson was sending communications using the Bar's email list, which he did not purchase but used without charge as a perquisite of his BOG position. When the government speaks, "it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by its individual messengers." Id. (internal quotation omitted). The Bar's requirement of preapproval does nothing more.

Paulson alleges that defendants' defamatory statements were in retaliation for his speech. Damage to reputation is not actionable under § 1983, however, unless it is accompanied by a more tangible interest, such as loss of a job. This rule of law cannot be avoided by alleging that the defamation occurred in retaliation for the exercise of a First Amendment right. Gini v. Las Vegas Metropolitan Police Dept., 40 F.3d 1041, 1045 (9th Cir. 1994). The remedy for the defamation by a public official is under state tort law and not the First Amendment. Id.

In summary, none of the acts that Paulson complains of can support a First Amendment retaliation claim. I grant summary judgment dismissing it.

II.    Defamation Claims

"A defamatory communication is one that would subject another to hatred, contempt or ridicule [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]." Reesman v. Highfill, 327 Or. 597, 603, 965 P.2d 1030 (1998) (internal quotation omitted). A statement must be both false and defamatory to be actionable. The court determines whether a statement is capable of a defamatory meaning in context. Even if a statement is not defamatory on its face, it is defamatory if a reasonable person could draw a defamatory inference from it. The link between the defamatory inference and the statement must not be too tenuous. Id. at 603-04.

Paulson alleges several defamatory remarks in the SAC, some of which I struck because the speaker was protected by a privilege or immunity. The following allegations remain.

A.    Remarks to the Judiciary

Paulson alleges that Rawlinson defamed him in a conversation about Paulson's disciplinary case with the Honorable Douglas Beckman, a witness in the disciplinary case.

Rawlinson attended a monthly judges' meeting with fellow BOG member Albert Menashe so that they could invite the judges to the Bar's annual convention dinner and Tent Show. At the meeting, Rawlinson sat two chairs away from Judge Beckman but never spoke with him about Paulson's disciplinary cases. Judge Beckman sat next to Menashe and commented to him that he [Judge Beckman] was going to be deposed for the first time in his career by a fellow BOG member, Paulson. Judge Beckman also commented to Menashe that Paulson noticed his deposition without providing any notice to his chambers. Further, Judge Beckman told Menashe that he thought it odd that a member of the BOG was simultaneously defending a disciplinary prosecution. Menashe told Judge Beckman that the BOG was considering the circumstances. That was the end of the discussion. There is no evidence that Rawlinson made any defamatory statement to Judge Beckman.

Paulson alleges that Carter defamed him in a conversation with Chief Justice Wallace Carson. SAC ¶ 35.

Because the Bar is an instrumentality of the Judicial Department of the State of Oregon, Carter considered the Chief Justice of the Oregon Supreme Court to have significant authority over the Bar. Carter advised Chief Justice Wallace P. Carson, Jr. that a member of the BOG would be subpoenaing him for a deposition taken in defense of a disciplinary prosecution. Carter states that he conveyed this information in a brief remark to Chief Justice Carson without further comment. Chief Justice Carson recalls Carter telling him that a fellow BOG member, Paulson,

had indicated an intent to subpoena him for a deposition in connection with Paulson's defense of a formal disciplinary prosecution. Chief Justice Carson thanked Carter for informing him. There was no further discussion on the topic.

Carter made a statement of fact briefly conveying Paulson's written intention. There is nothing defamatory in the remark.

Paulson alleges that he learned from the Honorable Robert J. Huckleberry in December 2004 that Paulson was the subject of negative discussions at the October 2004 Judicial Conference.

Judge Huckleberry took over judicial responsibilities in a Tillamook county case, Rebuth v. Garibaldi Dry Dock (Case No. 99-2079). Paulson represented plaintiff Rebuth. Paulson questioned Judge Huckleberry in court on December 13, 2004 about possible bias. Judge Huckleberry told Paulson that he had no communications with any person which would have any effect on being able to fairly and impartially continue as judge in the Rebuth matter. Judge Huckleberry also told Paulson:

> 5. . . . I either heard someone mention Mr. Paulson's name, or that I responded to a question concerning Mr. Paulson during a meeting which involved other judges from around the State of Oregon. I recall that occurring at the October 2004 judicial conference at Salishan Lodge, Gleneden Beach, Oregon, however I do not recall the context in which Mr. Paulson's name to have come up as being pejorative in nature.

> 6. While I do recall Mr. Paulson's name to have come up in passing as I have said above, I have no memory of ever having any communication concerning Mr. Paulson with Mr. George Riemer, Mr. Jeffrey Sapiro, Ms. Karen Garst, Mr. William Carter, Mr. Dennis Rawlinson, Ms. Nena Cook or Ms. Lisa LeSage.

Huckleberry Decl. ¶¶ 5,6.

There is no evidence that any defendant made a defamatory remark about Paulson to Judge Huckleberry.

B.     Remarks to Clients

Paulson alleges that members of the Bar staff, at the behest of defendants, have defamed Paulson to his clients. SAC ¶ 73. The only evidence Paulson submits in support of this allegation is a statement in his declaration that in December 2004, a Bar investigator called and wrote to at least two of his clients and falsely advised them that he was under investigation for trust account violations. Defendants filed a declaration from Bar investigator, Lynn Bey-Roode. Trudy Brady-Aiello, a former employee of Paulson, submitted the complaint which stated that in 2002, Paulson caused improper transfers of money between his general account and client trust accounts. The trust accounts Aiello referred to were for Carlton Gestring and Robert Rebuth. The complaint is a matter of public record under Bylaw 18.103. In investigating the *Aiello* matter, Bey-Roode spoke to Gestring on December 10, 2004. She explained her position, that she was investigating a complaint about Paulson, and that anything Gestring stated to her would be a matter of public record. When Bey-Roode asked Gestring if he had an attorney, he responded that Paulson was his attorney. Bey-Roode then told Gestring that she would not interview him without first contacting Paulson. That was the only contact with Gestring.

The only evidence in the record is that Bey-Roode truthfully explained to Gestring why she was contacting him and referred to the public record complaint. There is no evidence that a defamatory remark occurred.

Bey-Roode's contact with Rebuth was in a letter, to which Rebuth did not respond. The letter only asks to speak to Rebuth about an investigation of Paulson. No details are given. The letter is not defamatory.

Moreover, Bar investigators are protected by absolute immunity under ORS 9.537(2) in the performance of their duties concerning proposed or pending disciplinary proceedings. The immunity would apply here.

C.    Carter's Email

On April 20, 2004, Carter sent an email to Riemer, Cook, and Garst stating:

> Finally, I think I'd like to meet with you, George & Nena to discuss Lauren Paulsen's [sic] behavior – not so much his ethical behavior, since that is within Jeff's jurisdiction, but behavior that could prove damaging to the bar. I would like a summary of the more egregious examples of his Rambo style of defending himself by charging disciplinary Board members with violations, unnecessarily subpoenaing trial and appellate judges, etc. If it reaches the point where we think it is damaging to the organization (and I have no reason to think it won't), I don't think it would be unreasonable to advise prominent members of the bar in his Region 4 what he is up to, in order that they can consider what, if anything, they want to do about it. I recognize that this may be exactly what he wants (attention and recognition for his status as a "rebel"), but I don't think we can sit by and let him disrupt the bar and courts while he is a representative of the bar.
>
> I don't want to have any contact with Jeff on this issue, because I don't want to interfere, or even appear to be interfering, with his discretion on the ethics issues.

Carter Decl. Ex. 8.

I previously ruled that this statement was capable of defamatory meaning because it could lower the community's opinion of Paulson. I must revisit that conclusion based on a different analysis. Defendants contend that the statements in the email are not actionable because they are expressions of opinion.

The First Amendment protects some types of speech from defamation claims. Two such protections are for statements of opinion that address matters of public concern and do not "contain a provably false factual connotation," and for statements that "cannot reasonably [be] interpreted as stating actual facts." <u>Gilbrook v. City of Westminster</u>, 177 F.3d 839, 861 (9th Cir.), <u>cert. denied</u>, 528 U.S. 1061 (1999) (internal quotation omitted). The court uses a three-part test to examine the totality of the circumstances in which the statement was made:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement is sufficiently factual to be susceptible of being proved true or false.

<u>Id.</u> at 862 (internal quotation omitted). Applying these factors, <u>Gilbrook</u> concluded that a city councilor's statement that the president of the fire fighter's union was "a Jimmy Hoffa" was not actionable in the context of a bitter political dispute over the organization and financial aspects of the fire department. <u>Id.</u> at 862-63. The "reference to Jimmy Hoffa was the type of rhetorical hyperbole or caustic attack that a reasonable person would expect to hear in a rancorous public debate involving money, unions, and politics. Therefore, the statement could not give rise to a cognizable claim of defamation." <u>Id.</u> at 863.

The general tenor of the email is that Carter is unhappy with Paulson's defense tactics and considers them a disruption of the Bar and the courts. The statement was made in the context of Carter's apparent embarrassment that any unhappiness on the part of the subpoenaed judges might also reflect on the Bar itself because of Paulson's BOG membership. Moreover, the Bar was having to use its resources to investigate the ethics complaints Paulson was filing against Bar

staff and volunteer Disciplinary Board Trial Panel attorneys.  Carter only sent the email to three

people, all of whom are members of the BOG or Bar staff.

The reference to a Rambo style of defense is clearly hyperbolic language that would be

understood to mean an extremely vigorous defense.  The phrase "what [Paulson] is up to" refers

to the previously stated list of defense tactics of charging Disciplinary Board members and

subpoenaing judges.  A reasonable person would not construe it further.  The end of the first

paragraph states Carter's opinion that these tactics are a disruption of the Bar and courts.

The final factor is whether the statement is sufficiently factual to be susceptible of being

proved true or false.  None of the email has factual assertions other than that Paulson's behavior

could prove damaging to the Bar and disrupt the Bar and courts.  Because the level of damage

and disruption generally can vary from trivial to a complete shutdown of the institution, the

statements are not of a nature that can be proven true or false.

Another aspect of the context of the email is that Paulson chose to be elected to his BOG

position and to challenge some aspects of the Bar's management, such as how disciplinary

complaints are handled.  He has embroiled himself in a political battle.  As in Gilbrook, there are

implications of this type of dispute – people fight back.  The First Amendment protects much of

this behavior because the statements from both sides of a dispute inform the public.  I conclude

that Carter's email enjoys First Amendment protection as a statement of opinion that is not

factual enough to be proven true or false.

D. <u>Bar Leader Communicator</u>

Paulson alleges that the individual defendants caused the following statement to be published in an official Oregon State Bar publication, the <u>Bar Leader Communicator</u>, in August 2004:

> Board Member Lisa LeSage expressed a number of concerns about the conduct of Mr. Paulson as a board member including that Mr. Paulson had an actual conflict of interest in serving on the board while making allegations against board members and staff in his pending disciplinary proceeding. Other board members expressed similar concerns. Mr. Carter indicated he would appoint a special board committee composed of Mr. Rawlinson, Mr. Gaydos and Mr. Comstock to consider the options available to the board on this topic and to meet with Mr. Paulson. Mr. Paulson indicated he would participate and that he welcomed the chance to explain his actions.

SAC ¶ 31; Garst Decl. Ex. 11.

The <u>Bar Leader Communicator</u> was authorized by the BOG as a way of keeping the HOD informed. It is mailed to the HOD members and published on the Bar's web site. Garst drafts its content after each BOG meeting. Carter and Riemer reviewed and approved the content of this particular issue.

Fair and impartial reports of judicial, executive, legislative, and sometimes other public official proceedings are covered by a qualified privilege, even if the report contains matters that would otherwise be defamatory. <u>Kilgore v. Koen</u>, 133 Or. 1, 8, 288 P. 192 (1930).

A qualified privilege exists to protect three types of statements: "(1) those made to protect the defendant's interests; (2) those made to protect the plaintiff's employer's interests; or (3) those made on a subject of mutual concern to the defendant and the persons to whom the statement was made." <u>DeLong v. Yu Enterprises, Inc.</u>, 334 Or. 166, 170, 47 P.3d 8 (2002) (internal quotation omitted). The defense of qualified privilege requires a plaintiff to prove that a

defendant acted with actual malice and "abused the privileged occasion." Id. Actual malice is knowing that the statement is false or with reckless disregard of the statement's truth or falsity. Victoria v. LeBlanc, 168 Or. App. 586, 589, 7 P.3d 668 (2000).

Paulson does not contend that the Bar Leader Communicator's discussion was not a fair and impartial summary of LeSage's comment. Thus, it is protected by a qualified privilege. Paulson must prove that the publication abused the privilege and was done with actual malice. There is no evidence of either. As I previously ruled, LeSage's original comment was protected by a legislative immunity. The summary is a fair one and is published to the HOD to keep its members informed of topics under discussion at the BOG. This particular topic eventually resulted in the passage of Bylaw 18.6, thus demonstrating why it was important for the HOD to be kept informed on this issue.

I also do not agree with Paulson's argument that the "actual conflict" comment is untruthful because it does not match the definition under Bylaw 2.600, which defines an actual conflict to occur when a person will derive a private pecuniary benefit or detriment as the result of an action, decision, or recommendation of the person in the course of bar-related activities. A fair interpretation of LeSage's remark is that she was using the common English language definition of a conflict and did not refer to Bylaw 2.600. The term can also be used to refer to a conflict between one's obligations and self-interest, even in a nonpecuniary sense. Thus, there is no evidence of actual malice. The Bar Leader Communicator statement is not actionable because it is protected by a qualified privilege.

    E.    Summary

In summary, I grant summary judgment and dismiss the defamation claim.

## CONCLUSION

Defendants' Motion to Strike Portions of Plaintiff's Submissions in Opposition to Summary Judgment (#230) and Plaintiff's Motion to Enlarge Time to File Response to Defendants' Motion to Strike (#238) are moot. Defendants' Motion for Summary Judgment (#195) is granted. This action is dismissed with prejudice.

IT IS SO ORDERED.

Dated this ____16th_____ day of February, 2006.

_____/s/ Garr M. King_____
Garr M. King
United States District Judge